IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
EASTERN DIVISION

SONYA BAILEY,
and others similarly situated,

    Plaintiffs,

v.    No. 1:07-cv-1089

YOUTH VILLAGES, INC.,

    Defendant.

___

ORDER DENYING DEFENDANT'S RENEWED MOTION FOR
SUMMARY JUDGMENT AS TO FLSA COVERAGE
___

Sonya Bailey filed this civil action on behalf of herself and others similarly situated ("Plaintiffs") against Youth Villages, Inc., alleging violations of the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201 *et seq.*, 29 U.S.C. § 216(b), and 28 U.S.C. § 1337. On March 18, 2008, the Court partially granted and partially denied Bailey's motion for approval of her 29 U.S.C. § 216(b) Notice and Consent forms and for disclosure of the identities of employees of the Defendant who held the same position. (Docket Entry ("D.E.") No. 34.) It further held that Bailey could proceed with her suit as a collective action with the conditional class limited to "current and former overnight teacher-counselors who have worked at the [Defendant's] Deer Valley and Hobbs House locations." (Id.) Since this order, other plaintiffs have elected to join this lawsuit after receiving notice. The Defendant has filed a motion for summary judgment arguing that neither it nor its

facilities are covered by the FLSA.[1]  After consideration of the parties' respective positions, the Court DENIES the Defendant's renewed motion for summary judgment.

FACTUAL BACKGROUND

Youth Villages is a nonprofit organization that operates facilities in eight states, including Tennessee, and forty-four locations with the goal of helping troubled children and their families. (D.E. 60, Alexander Affid., at ¶ 3.)  It offers a variety of programs to serve the needs of its clients, including home-based counseling, residential treatment, foster care, adoption services, community-based services, transitional living services, family-based care for children with developmental disabilities, specialized crisis services, and intensive residential treatment.  (Id. at ¶ 6.)  The Internal Revenue Service recognizes Youth Villages as a public charity that is exempt from federal income tax under section 509(a)(2) of the Internal Revenue Code.  (Id. at ¶ 4.)

Bailey worked at two of Youth Villages's treatment facilities, Deer Valley in Linden, Tennessee and Hobbs House in Jackson, Tennessee.  (D.E. 60, Bailey Affid., at ¶ 5.)  She was employed at Deer Valley from April 18, 2005 to November 24, 2005 and with Hobbs House from June 19, 2006 to March 23, 2007.  (D.E. 60, Def.'s St. of Facts, at ¶¶ 7-8.)  Her job title was "overnight teacher counselor."  (Id. at ¶ 5.)  Bailey resigned from her position at Hobbs House after she was suspended due to a Department of Children's Services investigation involving her care of residents.  (D.E. 60, Pendleton Affid., at ¶ 7.)

---

[1]The Defendant previously filed a "Motion for Judgement on the Pleadings or, in the Alternative, for Summary Judgment" in which it advanced the same argument.  In an opinion by Senior Judge James Todd, this Court denied the Defendant's motion on April 29, 2008.  (D.E. 39.)

The Hobbs House consisted of a single "group home" that housed teenagers with behavioral problems. (Id. at ¶ 10.) Hobbs House provided therapy and other services to troubled teenage boys, who were age fourteen or older, for the purpose of reintegrating them into the community. (D.E. 60, Pendleton Affid., at ¶ 7.) All of its residents attended public school. (D.E. 60, Bailey Depo., at 107.) The staff members at this group home, including Bailey, served as counselors and teachers for the residents, helping them to resolve personal issues and develop life skills. (D.E. 60, Pendleton Affid., at ¶ 10.)

Deer Valley was a residential facility that provided behavioral modification treatment programs designed to enable "children in treatment and their families to identify, understand, and cope with their individual needs and develop the skills necessary to succeed in less restrictive settings." (Id. at ¶ 12.) It was not a licensed hospital, but provided its residents with services such as food, clothing, shelter, basic medical treatment, psychological counseling, recreation, and tutoring. (Id. at ¶ 13.) The clients of Deer Valley lived in residential cottages, where Bailey and other overnight teacher-counselors worked as part of the cottage staff. (Id. at ¶ 14.) While the Deer Valley campus had a separate certified school,[2] the cottage staff members also counseled the students with regard to the daily tasks of living and cooperating with others. (Id. at ¶¶ 15, 17.) For example, the overnight teacher-counselors taught life skills and assisted the residents in doing homework, preparing for bed, complying with treatment plans, and resolving interpersonal conflicts. (Id. at ¶ 19.) After the residents were asleep, the overnight teacher-counselors were permitted to do

---

[2]The Deer Valley school was a separate building, was operated by a separate staff, and maintained a separate budget from the residences. (D.E. 60, Pendleton Affid., at ¶¶ 21, 23.) The principal of the school reports to the Youth Villages Director of Education in Bartlett, Tennessee rather than the clinical and campus directors. (Id. at ¶ 21.) Residents in the counseling program that were capable of attending public school were permitted to do so. (Id. at ¶ 22.)

paperwork, read, watch television, sleep, or engage in other activities.  (Id. at ¶ 20.)

According to Bailey's affidavit, the management at Youth Village's facilities frequently talked about "mental or emotional evaluations of residents that were performed at the time of admission to the Deer Valley Cottages and to the Hobbs House Group Home."  (D.E. 19, Bailey Affid., at ¶ 6.)  She had been informed that some of the residents were "mentally retarded."  (Id. at ¶ 7.)  Further, she claimed she frequently reviewed residents' files as part of her job and, in doing so, observed initial psychiatric or psychological evaluations in the files.  (Id. at ¶¶ 8-9.)  Finally, she noted that the Youth Villages facilities regularly conducted "planning sessions" at which "mental health information from resident's evaluation was routinely discussed."  (Id. at ¶ 10.)  Subsequent to submitting this affidavit, the Plaintiff noted that, while working at Hobbs House, she occasionally looked at some of the children's charts, but not the portions that would have indicated "the kinds of problems they had before they came to Hobbs House."  (D.E. 60, Bailey Depo., at 91.)  She also said that, although the two or three residents' files that she looked at contained a tab labeled "psych evaluation," she did not read this section of the files and could not specifically attest to their contents.  (Id. at 102-03.)

According to Lisa Copeland, Director of Placement Services at Youth Villages, the clients of Hobbs House and Deer Valley were not referred or admitted because of a diagnosis of mental illness during the time period of 2005 to present, and any mental health issue of the residents would have been incidental, rather than the cause of admission.  (D.E. 60, Copeland Affid., at ¶¶ 5-6, 19.)  She asserted that the admission criteria to the Hobbs House pertained to the residents' issues of

delinquency, behavior problems, abuse, and neglect.[3] (Id. at ¶ 10.) She further claimed that admission decisions were made by Youth Villages's placement specialists, who were required to have a bachelor's degree or an equivalent combination of experience and training, but were not psychiatrists, psychologists, or physicians. (Id. at ¶¶ 11-12.) In a vast majority of cases, applicants to these facilities were referred by the Tennessee Department of Children's Services ("DCS"). (D.E. 68, Alexander Depo., at 10.) After receiving a referral, the placement specialists would evaluate the referral packet with the admission criteria and determine what program, if any, would be most appropriate for the candidate. (D.E. 60, Copeland Affid., at ¶ 15.) When particular teenagers exhibited high risk behaviors, other member's of Youth Villages's staff sometimes would review the referral, but these staff members also were not physicians, psychiatrists, or psychologists. (Id. at ¶ 16.)

According to Yvette Mason, a Resource Manager at the DCS, a former overnight teacher counselor, and an "opt-in" plaintiff in this case, the State of Tennessee classified Hobbs House and Deer Valley as "Level III facilities." (D.E. 68, Mason Affid.) She also asserted that, in order for a teenager to be admitted into a Level III facility, he or she must undergo "a psychiatric evaluation

---

[3]According to Copeland, the admission criteria for Hobbs House were as follows:
> [T]he youth must pose a low to medium risk of harm to self or others, including having behavior problems that could be treated and maintained in a group home and that would respond to behavior modification. Additionally, the youth had to be medically stable; have no current psychotic symptoms or episodes; and be unable to live with family, as well as the ability to attend public schools.

(D.E. 60, Copeland Affid., at ¶ 17.) She also claimed admission criteria for Deer Valley were as follows:
> [T]he youth pose[s] a medium to high risk of harm to self and others as demonstrated by behavior. If the youth has any psychotic symptoms, such symptoms must be intermittent and stabilized by medications. The youth must also have a history of unsuccessful interventions at a lower level.

(Id. at ¶ 18.)

5

or consultation as a cause admission [sic]," and only children with "moderate to severe health treatment needs" are admitted.  (Id.)  Mason submitted a document, which she referred to as "Tennessee's guidelines for Level III Residential Treatment."  (D.E. 68, Mason Affid., at 5.)  According to this document, two of the six criteria that must have been met for admission to a "Level III residential program" were the following:

> a. The youth has a significantly severe mental health disorder (DSM-IV-TR) and is impaired in social, educational, familial, and occupational functioning.  This level of functioning is not due exclusively to mental retardation, organic dysfunction, or developmental disabilities.  This disorder is amenable to "psychiatric treatment" and requires mental health treatment that cannot be successfully provided at a lower level of care.  The youth needs psychiatric consultation and access to physician services as well as daily supportive guidance toward stabilization.
>
> b. The youth is unable to adequately care for physical needs without external support that is beyond the capacity/capabilities of the family and./or other non-inpatient community support system representatives to provide.  This inability represents harm to self or others (e.g., reckless self-endangerment) and is due to psychiatric disorder not developmental, social, cognitive, or specific medical limitations.

(D.E. 68, Attachment to Mason Affid., at 5.)  This document also provided the following information about Level III residents:

> Children have been identified as having moderate to severe mental health treatment needs.
> . . . .
> Children may pose a high risk for elopement, instability in behavior and mental health status or, occasionally, experience acute episodes.  These youth also experience persistent maladjustment of peer and other social relationships or other influencing systems, which interfere with learning and social environments.
> . . . .
> The [individualized] treatment plan also will include all goals for educational issues, mental health needs (including therapy and psychiatric medications), substance use issues, physical/medical concerns, and family participation in treatment.

(Id. at 5-6.)  In addition to Mason, Deneen Alexander, Director of Financial Services at Youth Villages, estimated that about ninety percent of the residents at both Hobbs House and Deer Valley

were classified as Level III, and approximately ninety-five percent were referred by the Tennessee DCS. (D.E. 68, Alexander Depo., at 6, 10.)

After reading Mason's affidavit, Copeland prepared another affidavit attempting to explain a distinction between a "Level III" facility and a "Level III Continuum" facility. (D.E. 83, Copeland Affid., at ¶ 9.) She claimed that "[d]uring the period of 2005 through 2008, the children were placed by DCS at Youth Villages' Deer Valley and Hobbs House facilities under a Level III Continuum contract," as opposed to a "Level III" contract. (Id. at ¶ 11.) She also attached a document that laid out "Level III Continuum" requirements, which included the following:

> Children appropriate for this level of care may have medical or psychiatric disorders which require twenty-four (24) hour intervention and supervision such as an eating disorder, disordered thought process, brittle unstable diabetes, suicidal ideations, sexual impulse disorders or impulsive acts of aggression.

(D.E. 83, Attachment to Copeland Affid., at 160 (emphasis added).) She noted that this permissive language indicates that a mental disorder was not an absolute prerequisite for admission.

It is undisputed for the purposes of this motion that, while Bailey and the other Plaintiffs were employed as overnight teacher-counselors, the Defendant did not pay them at an overtime rate when they worked more than forty hours per week.

## STANDARD OF REVIEW

In considering summary judgment, the Federal Rules of Civil Procedure provide that

> judgment . . . should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law.

Fed. R. Civ. P. 56(c); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986); Canderm Pharmacal, Ltd. v. Elder Pharms, Inc., 862 F.2d 597, 601 (6th Cir.

7

1988).  In reviewing a motion for summary judgment, the Court views the evidence in a light most favorable to the nonmoving party.  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986).  When the motion is supported by documentary proof, such as depositions and affidavits, the nonmoving party may not rest on the pleadings but, rather, must present some "specific facts showing that there is a genuine issue for trial."  Celotex, 477 U.S. at 324; see also Abeita v. TransAmerica Mailings, Inc., 159 F.3d 246, 250 (6th Cir.1998).  It is insufficient for the nonmoving party "simply [to] show that there is some metaphysical doubt as to the material facts."  Matsushita, 475 U.S. at 586.  These facts must be more than a scintilla of evidence and must meet the standard of whether a reasonable juror could find by a preponderance of the evidence that the nonmoving party is entitled to a verdict.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986).  Summary judgment must be entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  Celotex, 477 U.S. at 322.  In this Circuit, "this requires the nonmoving party to 'put up or shut up' [on] the critical issues of [an] asserted cause[] of action."  Lord v. Saratoga Capital, Inc., 920 F. Supp. 840, 847 (W.D. Tenn. 1995) (citing Street v. J.C. Bradford & Co., 886 F.2d 1472, 1478 (6th Cir. 1989)).  Finally, the "judge may not make credibility determinations or weigh the evidence."  Adams v. Metiva, 31 F.3d 375, 379 (6th Cir. 1994).

## ANALYSIS

Section 207(a) of the FLSA provides, in part:

> Except as otherwise provided in this section, no employer shall employ any of his employees who in any workweek is engaged in commerce or in the production of

>    goods for commerce, or is employed in an enterprise engaged in commerce or in the
>    production of goods for commerce, for a workweek longer than forty hours unless
>    such employee receives compensation for his employment in excess of the hours
>    above specified at a rate not less than one and one-half times the regular rate at
>    which he is employed.

29 U.S.C. § 207(a)(1). The Plaintiffs assert that because they were not paid one and one-half times their regular rate for their work hours exceeding forty per week, they are entitled to damages pursuant to § 216(b), which states:

>    Any employer who violates the provisions of section 6 or section 7 of this Act [29 USCS
>    §§ 206 or 207] shall be liable to the employee or employees affected in the amount of
>    their unpaid minimum wages, or their unpaid overtime compensation, as the case may be,
>    and in an additional equal amount as liquidated damages.

29 U.S.C. § 216(b). The Defendant disputes, however, that the FLSA applied to the Plaintiffs' positions as overnight teacher-counselor at its facilities. In the Sixth Circuit, an employer claiming to be exempt from FLSA requirements bears the burden of proving a specific exemption applies. Homemakers Home & Health Care Servs., Inc. v. Carden, 538 F.2d 98, 101 (6th Cir. 1976).

Pursuant to the FLSA, a particular employment position may be subject to overtime requirements through either "individual" or "enterprise" coverage, Tony & Susan Alamo Foundation v. Secretary of Labor, 471 U.S. 290, 295 n.8, 105 S. Ct. 1953; 85 L. Ed. 2d 278 (1985), but only the latter is at issue in this case. In order for the FLSA to apply to the overnight teacher-counselor positions, the Defendant's Hobbs House and Deer Valley facilities must have been "enterprise[s] engaged in commerce or in the production of goods for commerce," and the Plaintiffs must have been "employees" within the meaning of the FLSA.[4] Tony & Susan Alamo Found., 471 U.S. at 295.

---

[4] The term "employee" generally means "any individual employed by an employer" with some specific statutory exceptions. 29 U.S.C. § 203(e). For the purposes of this motion, the parties do not dispute that the Plaintiffs were employees of Youth Villages.

9

The term "enterprise" means "the related activities performed (either through unified operation or common control) by any person or persons for a common business purpose . . . ." 29 U.S.C. § 203(r)(1). Although nonprofit organizations are generally excluded from coverage,[5] Wagner v. Salvation Army, 660 F. Supp. 466, 467 (E.D. Tenn. 1986), the FLSA provides that "activities performed for a business purpose" include work

> in connection with the operation of a hospital, an institution primarily engaged in the care of the sick, the aged, or the mentally ill or defective who reside on the premises of such institution, a school for mentally or physically handicapped or gifted children, a preschool, elementary or secondary school, or an institution of higher education (regardless of whether or not such hospital, institution, or school is public or private or operated for profit or not for profit).

29 U.S.C. § 203(r)(2)(A); see also § 203(s)(1)(B).[6]

The Plaintiffs assert that Deer Valley and Hobbs House constitute "institution[s] primarily engaged in the care of . . . the mentally ill or defective who reside on the premises of such institution," and therefore qualify as covered enterprises under the FLSA. 29 U.S.C. § 203(r)(2)(A). In its Field Operations Handbook,[7] the United States Department of Labor has provided the

---

[5] In discussing the use of the phrase "common business purpose" in the 1961 Amendments to the FLSA, the Senate Committee Report indicated that the
> definition would not include eleemosynary, religious, or educational organizations not operated for profit. The key word in the definition which supports this conclusion is the word "business." Activities of organizations for the type referred to, if they are not operated for profit, are not activities performed for a "business" purpose.

S. Rep. No. 1744, 86th Cong., 2d Sess., 28 (1960).

[6] Additionally, the United States Supreme Court has held that "[a]ctivities of eleemosynary, religious, or educational organization[s] may be performed for a business purpose" when these nonprofit organizations "engage in ordinary commercial activities . . . ." Tony & Susan Alamo Found., 471 U.S. at 295 (quoting 29 C.F.R. § 779.214 (1984)).

[7] Courts have said that an internal agency handbook "is entitled to deference to the extent it is persuasive, and it is entitled to great deference insofar as it is interpreting the agency's own regulations." Newton v. FAA, 457 F.3d 1133, 1136 (10th Cir. 2006) (citing United States v.

following guidelines for determining whether a nonprofit organization falls under one of the categories in § 203(r)(2)(A):

> For enforcement purposes, a private institution for the residential care of emotionally disturbed persons would come within the coverage of [the FMLA] if more than 50% of its residents have been admitted by a qualified physician, psychiatrist, or psychologist. For purposes of the 50% test, the term "admitted" includes evaluations of mental or emotional disturbance by a qualified physician, psychiatrist, or psychologist either subsequent to admission to the institution or preceding admission and being the cause for referral.

(D.E. 60, Dept. Of Labor, Field Operations Handbook, § 12g12.) With this background, the Court will address several issues raised by the parties regarding whether Youth Villages is covered by the FLSA.

First, the Plaintiffs point to Mason's affidavit and the documents that she provided to show that more than half of the residents of both Hobbs House and Deer Valley, pursuant to their status as Level III residents, were admitted for moderate to severe mental health disorders, as evidenced by the criteria used by the Tennessee DCS. (D.E. 68, Attachment to Mason Affid., at 5.) Mason claims to have obtained this information through her work as a Resource Manager at the DCS, where she was responsible for monitoring facilities that care for children with mental health treatment needs, including Hobbs House and Deer Valley. (Id. at 1.) The Plaintiffs note that the documents provided by Mason indicate that all Level III residents necessarily had a "significantly severe mental health disorder" and required "psychiatric consultation and access to physician services." (Id. at 5.)

---

Mead, 533 U.S. 218, 226-27 (2001)); see also Via Christi Reg'l Med. Ctr., Inc. v. Leavitt, 509 F.3d 1259, 1272 (10th Cir. 2007). In this case, the Plaintiffs rely on the Department of Labor's statutory interpretation in its handbook, and the Defendant raises no objection in this motion. Because neither party disputes the agency's interpretation, the Court will apply § 12g12 of the DOL handbook without holding whether it constitutes a correct interpretation of 29 U.S.C. § 203(r)(2)(A).

Further, other proof indicates that about ninety percent of the residents were classified as Level III, and approximately ninety-five percent were referred by the Tennessee DCS. (D.E. 68, Alexander Depo., at 6, 10.) Given this evidence, the Plaintiffs assert that a reasonable inference would be that at least half the residents had been evaluated by "a qualified physician, psychiatrist, or psychologist" either "subsequent to admission" or "preceding admission and being the cause for referral."[8] (D.E. 60, Dept. Of Labor, Field Operations Handbook, § 12g12.) The Defendant attempts to rebut this argument by pointing to the affidavit of Copeland, particularly her assertion that Hobbs House and Deer Valley followed the admission guidelines for "Level III Continuum of Care," rather than "Residential Treatment Level III."[9] (D.E. 83, Copeland Affid., at ¶¶ 9, 11.) As such, it argues that the guidelines that were actually applied did not require diagnosis of a mental or emotional disturbance as a prerequisite for admission. (D.E. 83, Attachment to Copeland Affid., at 160.) Copeland also claimed that Mason was "not in a position to know what contracts DCS had for each

---

[8] The Plaintiffs also argue that the following opinion letter from the Department of Labor is analogous to this case:
> [I]n describing the services that your client provides, you state that upon admission to the home, each child is assigned a social worker and a group leader to coordinate the "child's treatment." You note that the non-profit offers such programs and services as a structured behavioral management program; a supervised treatment program; and individual, group, and family therapy. Given this clearly therapeutic purpose, we cannot specifically conclude whether the non-profit is engaged in the operation of "an institution primarily engaged in the care of . . . the mentally ill or defective who reside on the premises of such institution" with the meaning of [§ 203(s)(1)(B).]

(D.E. 60, DOL Opinion Letter, FLSA2005-8NA (Sept. 2, 2005)). The Plaintiffs argue that, like the nonprofit organization to which this letter was addressed, the Defendant provided mental health services to its residents, and this indicates that it could have been primarily engaged in the care of the mentally ill.

[9] According to Copeland, these terms refer to the funding source, and there is no "Level III facility" license. (D.E. 83, Copeland Affid., at ¶¶ 8-9.)

12

child at Deer Valley and Hobbs House during" the relevant period and, thus, could not have had personal knowledge of the information outlined in her affidavit without reviewing each child's contract. (D.E. 83, Copeland Affid., at ¶ 4.)

In light of these arguments, the Court finds a disputed question of material fact regarding what admission criteria was used to assess the residents of Hobbs House and Deer Valley and, consequently, whether mental evaluations by trained professionals were a mandatory step in the admission of the majority of their residents. The Court cannot determine from the conflicting affidavits of Mason and Copeland which set of attached guidelines were actually applied to incoming residents. This fact would be material in regard to the issue of whether more than half of the residents were "admitted by a qualified physician, psychiatrist, or psychologist," which is relevant to whether the Youth Villages facilities were covered by the FLSA pursuant to § 203(r)(2)(A).[10] (D.E. 60, Dept. of Labor, Field Operations Handbook, § 12g12.) Although Copeland claimed that Mason could not have had personal knowledge of the facts to which she attested, the Court cannot make credibility determinations or weigh the evidence at this stage. Adams, 31 F.3d at 379.

Second, the Plaintiff alludes to the following facts established by Bailey's affidavit:[11] (1) the

---

[10]The Defendant argues that even if a mental health disorder was one of many criteria for being considered a "Level III resident," it cannot be said to be the "cause of admission." (D.E. 83, Def.'s Reply, at 4.) To the contrary, if a mental health condition was, as the document presented by Mason suggests, a mandatory criterium, then a resident could not be admitted pursuant to a Level III contract but for a diagnosis of this condition. A trier of fact could deem that sufficient to find causation. Likewise, a reasonable trier of fact could infer that the majority of residents' diagnoses of mental health disorders were performed by a qualified professionals. (See D.E. 60, Dept. of Labor, Field Operations Handbook, § 12g12.)

[11]In this Court's previous Order Denying Defendant's Motion for Judgment on the Pleadings and/or for Summary Judgment, these facts were used as a basis for finding disputed

Defendant's managers frequently talked to her about mental or emotional evaluations of residents that were performed at the time of admission; (2) they informed her that some of the residents had been diagnosed as mentally retarded; (3) she had access to files, which she claimed included initial psychological evaluations; (4) and the facilities conducted "planning sessions," at which mental health information from the residents' evaluations were discussed. (D.E. 39, Order Denying Mot. for J. on Pleadings or S.J., at 7.) The Defendant argues that some of these assertions in Bailey's affidavit were later contradicted by her deposition testimony. Specifically, it contends that Bailey's statement that she never looked at the portions of the residents charts that indicated "the kinds of problems they had before they came to Hobbs House" contradicted her previous statement that the files she reviewed contained "initial psychiatric or psychological evaluation[s]." (D.E. 60, Bailey Depo., at 91; Bailey Affid., at ¶ 9.) Additionally, the Defendant contests that Bailey's deposition testimony that she "hardly ever" reviewed the residents' files was inconsistent with the statement in her affidavit that she "frequently reviewed" them. (D.E. 60, Bailey Depo., at 91; Bailey Affid., at ¶ 8.) Youth Villages also refers to a portion of Bailey's deposition, which it claims indicates that the residents' behavioral problems, rather than mental health issues, were discussed at the meetings.[12]

After comparing Bailey's affidavit with the portions of her deposition cited by the Defendant, the Court finds that, to the extent that the two may be interpreted as inconsistent, the

---

issues of fact and therefore denying the motion. (D.E. 39, Order Denying Mot. for J. on Pleadings or S.J., at 7.)

[12]The Defendant does not point to evidence that contradicts Bailey's assertions that she heard the members of the management say that some of the residents had been diagnosed as mentally retarded or that she had heard them discuss mental or emotional evaluations performed prior to admission. (D.E. 19, Bailey's Affid., at ¶¶ 6-7.)

differences are not so irreconcilable that Bailey's testimony should be disregarded at this stage in the litigation. For instance, when Bailey said that she "frequently reviewed" the files in one instance but later said that she "hardly ever" reviewed them in another, this inconsistency is not so egregious or material that it would somehow nullify her testimony. Rather, this ostensible contradiction would be something for the trier of fact to consider when assessing Bailey's credibility. Adams, 31 F.3d at 379. Bailey should be afforded the opportunity to explain the basis for the statements in her affidavit, such as what prompted her to believe that the residents' files contained "initial psychiatric or psychological evaluation[s]."[13] (D.E. 60, Bailey Affid., at ¶ 9.) Additionally, simply because the Plaintiff stated in her deposition that the residents' behavioral problems were discussed in the meetings does not preclude the possibility that their mental health was also discussed. In short, although the Defendant may use the arguably inconsistent statements in Bailey's deposition to impugn her credibility or elicit further explanation, nothing in her deposition testimony has settled the disputed issues of fact previously raised by her affidavit.[14] (D.E. 39, Order Denying Mot. for J. on Pleadings or S.J., at 8.)

Third, the Plaintiffs argue that, because the Defendant admitted that it was covered by the

---

[13] The Plaintiffs' brief asserts that Bailey inferred that each file contained these evaluations because "she saw 'tabs' in the files that read 'psyche evaluation'" and had papers behind them. (D.E. 68, Pl.'s Response, at 11.) Assuming this to be her basis for making these statements in her affidavit, the Court agrees that whether her inference was reasonable is a question for the trier of fact.

[14] The Defendant also argues that "Bailey's claims should be dismissed as a sanction for giving false testimony under oath," alluding to the Court's inherent power to impose sanctions for bad-faith conduct. (D.E. 60, Def.'s Mot. for S.J., at 19.) However, none of the inconsistencies that may be attributed to Bailey are so blatant or egregious to suggest bad faith or a fraudulent intent. As such, the Court denies the Defendant's request for dismissal as a sanction.

FLSA in the prior proceeding of Fowlkes v. Youth Villages, judicial estoppel bars the Defendant from denying that it is covered under the FLSA in this proceeding. The doctrine of judicial estoppel provides that when a party successfully and unequivocally asserts a position in one proceeding, that party cannot assert an inconsistent position in a subsequent proceeding. Edwards v. Aetna Life Ins. Co., 690 F.2d 595, 598 (6th Cir. 1982) (citing Smith v. Montgomery Ward & Co., 388 F.2d 291, 292 (6th Cir. 1968)). The purpose of this doctrine is "to protect the integrity of the judicial process" by preventing internal inconsistency. Edwards, 690 F.2d at 598-99. Although, "the rule can not be applied in a subsequent proceeding unless a party has successfully asserted an inconsistent position in a prior proceeding." Id. at 599 (emphasis added) (citing City of Kingsport v. Steel & Roof Structures, Inc., 500 F.2d 617, 620 (6th Cir. 1974)). Where the initial proceeding resulted in a settlement, "the position cannot be viewed as having been successfully asserted." Id. (citing City of Kingsport, 500 F.2d at 620).

In Fowlkes v. Youth Villages, which was a case filed in the Middle District of Tennessee, a former employee sued Youth Villages, and one of the factual allegations pled in the complaint was that "[t]he Defendant is a covered 'employer' under the FLSA." (D.E. 19, Fowlkes Complaint, at ¶ 5.) The Defendant then admitted this allegation in its answer. (D.E. 19, Fowlkes Answer, at ¶ 5.) In the Fowlkes case, however, the plaintiff accepted Youth Villages's offer of judgment pursuant to Rule 68 prior to trial. (D.E. 19, Fowlkes Rule 68 Acceptance.) Because the case was settled and a disposition on the merits was never reached, Youth Villages cannot be said to have "successfully" asserted its position for the purpose of the doctrine of judicial estoppel.[15] Edwards, 690 F.2d at 599.

---

[15]In addition, it is unclear whether an admission in an answer would constitute "assert[ing] a position" for the purposes of judicial estoppel. Edwards, 690 F.2d at 598. The Plaintiff has cited to no case law that would support this notion.

16

Thus, the Plaintiffs' argument–that the Defendant is judicially estopped from denying coverage under the FLSA–is unavailing. As noted in this Court's previous order, however, the Defendant's admission in Fowlkes may be used as a prior inconsistent statement for impeachment purposes. (D.E. 39, Order Denying Mot. for J. on Pleadings or S.J., at 7.)

Finally, the Defendant attempts to analogize this case with Kitchings v. Florida United Methodist Children's Home, Inc., 393 F. Supp. 2d 1282 (M.D. Fla. 2005). The facts of Kitchings involved employees[16] who sued for overtime compensation under the FLSA for work done for a nonprofit organization known as Children's Home that cared for dependant children in its facilities. Id. at 1284-85. Children's Home received most of its referrals from the State of Florida and some through private placement. Id. at 1285. The evidence presented for summary judgment showed that residents of Children's Home were "not admitted on the basis of mental health issues," and "[t]he primary reason for placement [was] that the child [was] unable to reside with [his or her] natural parents or guardians." Id. at 1285. Many of the children suffered from some form of psychological disorder, but "[i]f a child [had] a serious disorder, he or she [would not have been] accepted for residency because the Children's Home [was] not equipped to deal with those children." Id. The plaintiffs argued that Children's Home was covered by the FLSA because it "operated in conjunction with an institution primarily engaged in the care of the mentally ill." Id. at 1296. In assessing this argument, the court considered whether the "most important function of this facility"

---

[16]The title given to these employees was "Houseparent." Kitchings, 393 F. Supp. 2d at 1285-86. According to the Kitchings opinion, "The primary role of the [Houseparent] is to see to the day-to-day care and supervision of the children assigned to his/her care. The [Houseparent] is responsible for monitoring all the aspects of daily cottage life and is, in essence, the primary caring person for the Residents during their stay at the [Children's Home]." Id. at 1286 n.3 (citing Doc. 105, Att. 3, Ex. 8 (identified as "Houseparent's job description")).

was "to provide permanent housing for individuals who [were] there because they [were] mentally ill." Id. (quoting Murray v. R.E.A.C.H. of Jackson County, Inc., 908 F. Supp. 337, 340 (W.D.N.C. 1995)).  The Kitchings court determined that Children's Home was not "primarily engaged in treating the mentally ill" after considering the following facts established by the Defendant:

> the psychological therapy and counseling it offers are merely part of, or incidental to, its purpose of providing a home for dependant children and the ultimate goal of returning each Resident to family life in the community; <u>the primary criteria for admission is the fact that a child cannot be raised by his or her natural parents or guardians, and is not necessarily related to the mental health of the child</u>; and the fact that many Residents suffer from psychological and emotional problems is incidental to their status as neglected or dependent children.

Id. at 1296-97 (emphasis added).  The court then found that the plaintiffs' rebuttal proof was insufficient to overcome summary judgment because "nowhere [did] they assert that 'evaluations of mental or emotional disturbances' [were] 'the cause for referral,' which is the requirement of [section 12g12 of the Department of Labor] Handbook's 'fifty percent test.'" Id. at 1298.

While the Kitchings court granted summary judgment to the defendant, nothing in that opinion suggests that the plaintiffs had offered counter-proof that was similar in substance to the documentary evidence presented by the Plaintiffs in this case.  For example, in this case, Mason submitted a document that, though its applicability is disputed, tended to establish that "a severe mental health disorder" was an admission criterium for the majority of residents of Hobbs House and Deer Valley.  (D.E. 68, Attachment to Mason Affid., at 5.)  Also, Bailey attested that the residents' files contained mental evaluations, these evaluations were frequently discussed, the staff regularly discussed the mental health of the residents during "planning sessions," and some of the residents were classified as mentally retarded.  (D.E. 19, Bailey Affid., at ¶¶ 6-10.)  Further, Youth Villages's present assertion that it is not covered by the FLSA is impugnable by its admission to the

contrary in previous litigation. (D.E. 19, Fowlkes Answer, at ¶ 5.) When viewing this rebuttal proof in a light most favorable to the Plaintiffs, the Court finds that, unlike in Kitchings, there are genuine issues of material fact concerning whether evaluations by mental health professionals caused more than fifty percent of the residents of Hobbs House and Deer Valley to be admitted. Thus, summary judgment, on the grounds that Youth Villages is not covered by the FLSA, is denied.

## CONCLUSION

For the reasons articulated herein, the Court **DENIES** the Defendant's renewed motion for summary judgment as to the Plaintiffs' FLSA claims.

IT IS SO ORDERED this 20th day of April, 2009.

                                                    s/ J. DANIEL BREEN
                                                    UNITED STATES DISTRICT JUDGE